IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| In re Detention of | ) | No. 82801-1-I |
| | ) | |
| | ) | |
| S.G., | ) | |
|           Appellant. | ) | UNPUBLISHED OPINION |
| | ) | |

VERELLEN, J. — S.G. contends his 14-day involuntary commitment is not supported by substantial evidence. But the testimony of S.G.'s mother, the physician assistant, and the mental health counselor supports the trial court's findings that S.G. suffers from unspecified schizophrenia spectrum disorder. And that finding, together with their testimony, supports the court's determination that S.G. suffered from a mental disorder and that as a result of his mental disorder, he was gravely disabled under definition (b).

Therefore, we affirm.

FACTS

On May 23, 2021, Lalonde Graham, S.G.'s mother, found S.G. in her bedroom with a "shoelace tied around his neck."[1] Graham called 911. S.G. was taken to Harborview Medical Center and was subsequently transferred to Cascade Behavioral Health.

---

[1] Report of Proceedings (RP) (June 7, 2021) at 13.

That day, the King County crisis responder filed a petition for initial commitment. The initial petition stated that S.G. "suffers from a behavioral health disorder characterized by delusions, disorganization, suicidal ideation, poor insight, and poor judgment."[2]

After S.G. was detained for 72 hours of psychiatric treatment, Patrick Swann, a mental health counselor at Cascade Behavioral Health, filed a petition for 14-day involuntary treatment. The petition alleged that S.G. was "in danger of serious physical harm" and was "gravely disabled" as a result of a "mental disorder."[3] Swann specifically noted that S.G. was "agitated, tangential, paranoid, uncooperative, reporting delusions that his eyes are cameras, reports killing people, sexually assaulting and abusing a daughter, reports auditory and visual hallucinations, and is disoriented and hard to follow."[4]

On June 7, 2021, at the probable cause hearing, the court found that S.G. suffered from "unspecified schizophrenia spectrum disorder" which has "a substantial [effect] on his cognitive and volitional functions."[5] The court also stated that, "[a]s a result of that mental disorder, he presents a likelihood of serious harm to himself, and that is as a result of his mental illness."[6] And the court concluded that S.G. was gravely disabled under "prong (b) in that he manifests severe

---

[2] Clerk's Papers (CP) at 1.

[3] CP at 20.

[4] CP at 21.

[5] RP (June 7, 2021) at 66.

[6] Id.

deterioration in routine functioning [and] a repeated and escalating loss of cognitive or volitional control over his actions."[7]

The court entered an order committing S.G. to 14-day involuntary treatment and entered findings of fact and conclusions of law.

S.G. appeals.

ANALYSIS

S.G. contends that the State failed to establish by a preponderance of evidence that his "behavioral health disorder" was a "mental disorder" rather than a "substance use disorder" and that the disorder caused his current condition.[8]

"When a trial court has weighed the evidence, appellate review is limited to determining whether substantial evidence supports the findings and, if so, whether the findings in turn support the trial court's conclusions of law."[9]  Evidence is substantial if it is sufficient to persuade a fair-minded person of the truth of the

---

[7] Id. at 68.  The court did not find that S.G. was gravely disabled under definition (a).

[8] Appellant's Br. at 6-7.  The State argues that we should dismiss S.G.'s appeal as moot.  But an appeal is not moot where the commitment order could result in collateral consequences for the individual.  See Born v. Thompson, 154 Wn.2d 749, 762-64, 117 P.3d 1098 (2005).  Because the 14-day involuntary commitment order here could have collateral consequences for S.G., we reach the merits.

[9] Matter of Det. of A.S., 91 Wn. App. 146, 955 P.2d 836 (1998) (citing In re Det. of LaBelle, 107 Wn.2d 196, 209, 728 P. 2d 138 (1986)), aff'd sub nom. In re Det. of A.S., 138 Wn.2d 898, 982 P.2d 1156 (1999).

finding.[10]  The trier of fact is solely responsible for making credibility

determinations.[11]  We review conclusions of law de novo.[12]

The involuntary treatment act provides:

> At the conclusion of the probable cause hearing, if the court finds by a preponderance of the evidence that such person, as the result of a behavioral health disorder, presents a likelihood of serious harm, or is gravely disabled, and, after considering less restrictive alternatives to involuntary detention and treatment, finds no such alternatives are in the best interests of such person or others, the court shall order that such person be detained from involuntary treatment not to exceed fourteen days in a facility licensed or certified to provide treatment by the department or under RCW 71.05.745.[13]

A "mental disorder" is defined as "any organic, mental, or emotional

impairment which has substantial adverse effects on a person's cognitive or

volitional functions."[14]

And a "substance use disorder" is defined as a "cluster of cognitive,

behavioral, and physiological symptoms indicating that an individual continues

using the substance despite significant substance-related problems."[15]

Here, Lindsey Helm, a physician assistant in the psychiatric emergency unit

at Harborview Medical Center, testified that on May 23, 2021, "when [S.G.] arrived,

he was quite agitated, showing signs of psychosis through paranoia, being unable

---

[10] Id. at 162.

[11] Morse v. Antonellis, 149 Wn.2d 572, 574, 70 P.3d 125 (2003).

[12] In re Estate of Haviland, 162 Wn. App. 548, 561, 255 P.3d 854 (2011).

[13] RCW 71.05.240(4)(a).

[14] Former RCW 71.05.020(37) (2021), recodified as RCW 71.05.020(38).

[15] Former RCW 71.05.020(51) (2021), recodified as RCW 71.05.020(53).

to track conversation well, and did not appear to be oriented."[16]  Helm noted that S.G. was "delusional, stating that [his] eyes are cameras . . . [that] his parents are cops . . . [and that he's] killed somebody."[17]  She testified that S.G. admitted to using heroin that day and methamphetamine the previous day.

And Swann testified that S.G. has an "organic impairment with mental and emotional components to it."[18]  He stated that the "working diagnosis" is "unspecified schizophrenia spectrum disorder" which "comes with five main tiers of symptoms:  hallucinations; delusions; disorganized thought; disorganized behavior; [and] negative symptoms."[19]  Swann testified that on June 7, before trial, and two weeks after S.G.'s last methamphetamine and heroin use, he had a "brief interview with S.G."[20]  He stated that during the interview, S.G. had "mumbling or slurred speech" and "immediately began a tangential thought, talking about discharge, and things of that nature."[21]  Swann opined that S.G.'s symptoms were due to his "mental disorder."[22]  And the trial court found Helm and Swann credible. Substantial evidence supports the court's findings that S.G. suffered from an organic impairment that affected his cognitive and volitional functioning, and those

---

[16] RP (June 7, 2021) at 22.

[17] Id. at 23.

[18] Id. at 31.

[19] CP at 33.

[20] Id.

[21] Id.

[22] CP at 32.

5

findings, in turn, support the trial court's conclusion that S.G. suffered from unspecified schizophrenia spectrum disorder.

S.G. also argues that the State failed to establish by a preponderance of evidence that he was gravely disabled under definition (b) because the State failed to prove that "involuntary treatment was essential to his health and safety."[23]

A person is gravely disabled under definition (b) if, as a result of a mental disorder, a person "manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety."[24] The court must provide a factual basis to conclude that a person "'manifests severe [mental] deterioration in routine functioning.'"[25] "'Such evidence must include recent proof or significant loss of cognitive or volitional control. In addition, the evidence must reveal a factual basis for concluding that the individual is not receiving or would not receive, if released, such care as is essential for his or her health or safety.'"[26]

Here, Graham testified that S.G. has told her "he should be dead for things that have happened or that he's done . . . [and] that he thought people would get

---

[23] Appellant's Br. at 15.

[24] RCW 71.05.020(24)(b); In re Det. of R.H., 178 Wn. App. 941, 946, 316 P.3d 535 (2014).

[25] In re Det. of M.K., 168 Wn. App. 621, 627, 279 P.3d 897 (2012) (alteration in original) (quoting LaBelle, 107 Wn.2d at 208).

[26] Id. (quoting LaBelle, 107 Wn.2d at 208).

6

rich if he was dead."[27]  Graham stated that approximately six months before trial, S.G.'s sister found him after he stabbed himself in the neck, and two weeks before trial, she "found him . . . with a shoelace tied around his neck" and "cuts on his neck."[28]  The court found Graham credible.

Helm testified that S.G. "is agitated, tangential, paranoid, and uncooperative, making history difficult to obtain.  The patient reports he wants to hang himself, wanting to find a way to kill himself.  I attempt every day, he says."[29] Helm also stated that S.G. reported that "he has a daughter and [that he] punched her when she was five" because he "tried to sexually assault her."[30]  And she noted S.G. stated he "hear[s] voices and there's tapping on my shoes, and I don't see anything, but there's tapping. . . . I'm fighting demons in my head, and I'm in a coma right now, I can change really fast."[31]

Swann opined that S.G. was "showing severe deterioration in routine functioning, evidenced by repeated and escalating loss of cognitive and volitional control over his action[s]."[32]  And Swann stated that due to his mental disorder, S.G. was unable "to provide for his essential needs of health and safety."[33]

---

[27] RP (June 7, 2021) at 11.

[28] Id. at 13.

[29] Id. at 23.

[30] Id.

[31] Id. at 24.

[32] Id. at 32.

[33] Id.

Substantial evidence supports the court's findings of fact that S.G. demonstrated severe deterioration in routine functioning. And those findings, in turn, support the court's conclusion of law that S.G. was gravely disabled under definition (b).[34]

    Therefore, we affirm.

WE CONCUR:

_____

_____

_____

---

[34] S.G.'s notice of appeal also lists the order disqualifying the trial court judge. But because S.G. did not assign error to the trial court's order, or provide any argument or specific authority regarding that order, we need not address the order disqualifying the trial court judge. RAP 10.3(a)(4), (6).